COURT OF APPEALS
DECISION
DATED AND FILED

November 4, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP820-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. **2000ME422**

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF L.J.M.:

WAUKESHA COUNTY,

    PETITIONER-RESPONDENT,

  V.

L.J.M.,

    RESPONDENT-APPELLANT.

        APPEAL from an order of the circuit court for Waukesha County: PAUL BUGENHAGEN, JR., Judge. *Affirmed.*

¶1     DAVIS, J.[1]     "Lisa"[2] appeals from an order extending her involuntary commitment under WIS. STAT. ch. 51.  We find that there was sufficient evidence that Lisa had a mental illness, was a proper subject for treatment, and was dangerous.  *See* WIS. STAT. § 51.20(1)(a).  Accordingly, we affirm.

## BACKGROUND

¶2     Lisa has diagnosed schizoaffective disorder and has been subject to a WIS. STAT. ch. 51 commitment order since 2000.  On August 27, 2019, the trial court held a hearing on the County's petition for a yearlong extension of Lisa's most recent order.  Three witnesses testified:  Katherine Andrews, Lisa's case manager; Dr. Terrill Bruett, a court-appointed psychologist; and Lisa.  Andrews and Bruett also wrote reports which were entered into evidence.

¶3     Andrews testified that she had been Lisa's case manager for "[a]bout a year" and that she recommended that Lisa "remain on a [WIS. STAT. ch.] 51 commitment at this time."  Andrews explained that Lisa was generally subject to outpatient commitment and was currently living in the community; however, the previous April, Lisa's "mental health started to decompensate."  This led to Lisa's temporary admission to inpatient care "to get her a little bit more medically stable, because she was becoming unsafe in my vehicle, as well as [in another case worker's] vehicle … from the amount of screaming and hitting that she was doing."  Lisa had also been unhappy with her intramuscular medication Haldol, so

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version.

[2]  For ease of reading, we refer to L.J.M. by the pseudonym "Lisa."

inpatient staff used the admission as an opportunity to transition Lisa to oral medication. This attempt, however, was unsuccessful—Lisa tried several oral medications but refused to keep taking any of them after three or four days. Lisa told Andrews that "she just [did]n't like to take oral medications," but she also did not want to take the specific drug Zyprexa because she believed it contained yellow dye, to which she was allergic.

¶4    Andrews further elaborated on her recommendation that Lisa remain under a commitment order. She explained that Lisa "continue[d] to have delusional thoughts that … [we]re unsafe." She cited as examples Lisa's belief that her soul was "gone," that someone was murdered in her apartment, and that her Haldol was "actually meth and crack." Lisa also did not believe that she was mentally ill, instead blaming her psychiatric symptoms on the Haldol. Thus, she "expressed … that she would not take medications without a court order." According to Andrews, if Lisa discontinued psychotropic medication, she would decompensate and again require inpatient care and, eventually, a new commitment order. This prediction was based on Lisa's current behavior even while on medication. Andrews noted, for example, that Lisa had a recent episode where she was "pulling her hair and screaming at me."

¶5    When asked whether Lisa had "[h]istorically … engaged in dangerous behavior when she was not taking medications," Andrews responded, "I do not know her from that time, I can only comment when I've had her and even on the medications, I've observed her hitting her head, has hit the vehicle." These behaviors were "usually better … right after [Lisa] [got] her [biweekly injection of] Haldol. It is a week that she's a little bit less agitated, and as we get close to the second week that she needs it, the agitation does increase." The hair pulling

described above, for example, occurred three days before Lisa was due for an injection.

¶6   Bruett, the psychologist, also testified. Bruett explained that he was appointed to examine Lisa by telephone and write a report for the hearing. Lisa, however, was uncooperative, "stat[ing] that, I won't talk to you or the other doctor, they only want … recommitment, they only do it for the money." When Bruett told Lisa that he would still need to file a report, "she began a monolog of telling me, again, how people are just wanting to re-commit her and that she wasn't going to cooperate." Bruett had examined Lisa more fully the year before, however, in connection with a prior commitment hearing; he had also reviewed Andrews's report. Thus, from the brief telephone call, the past examination, and Andrews's report, Bruett was able to form an opinion about Lisa's case.

¶7   Bruett testified that Lisa had schizoaffective disorder with paranoia, which manifested as a "substantial disorder of … thought, mood and perception" that "grossly impair[ed] her judgment and behavior." Medication, when taken consistently, enabled Lisa to live in the community and be treated on an outpatient basis; however, Lisa did not "recognize that she require[d] treatment with psychotropic medication." Bruett noted that Lisa displayed "mood instability, extreme irritability, paranoia and delusional thinking" even with medication, but he felt that medication nonetheless provided some benefit: "she's living out in the community now, rather than in a group home or a sheltered setting, so there has been some improvement."

¶8   It was Bruett's further opinion that Lisa "would be a proper subject for commitment, if treatment were withdrawn." Bruett based this conclusion on "[t]he 33 admissions that she's had to the Mental Health Center, her affect, her

denial of her illness and her denial of her need for medications," which together indicated that if Lisa "were not on commitment … it is highly unlikely she would … take medication and then [she would] regress and require inpatient treatment." Bruett also explained why Lisa was incompetent to refuse medication: she held "patently false beliefs about the medications" which rendered her substantially incapable of applying to her own situation an understanding of the advantages and disadvantages of, and alternatives to, accepting medication, so as to make an informed choice to accept or refuse medication.

¶9     Lisa testified too. She stated that she did not see any benefit from the Haldol and that she experienced "[a] lot" of side effects. Lisa explained that she did not like drugs and that if she were not subject to a commitment order she would "get weaned off" medication. From our review of the transcript, it appears that Lisa was at times disruptive and agitated during the hearing, although not violent, and she made several statements that indicated delusional or disordered thinking (for example, she said that there were "spirits … like demons" in her apartment because "[p]eople have died in that apartment").

¶10    The trial court found that Lisa was mentally ill and a proper subject for commitment. The trial court expressly determined that Lisa was dangerous, given her history of inpatient treatment and the testimony that she would be a proper subject for commitment if treatment were withdrawn. The court further noted that Lisa was dangerous because the "attempt to transition to another medication … didn't go well" and "she had to be treated inpatient again"; because Lisa was "becoming unsafe. She's screaming and hitting. She hits herself in the head"; and because "she's delusional." In addition, "the history of the case shows that without proper medication, she does decompensate and becomes in need of inpatient care again." The court also determined that Lisa was not competent to

5

refuse medication and treatment. Therefore, the court entered orders for a twelve-month extension of outpatient commitment and for involuntary medication and treatment. This appeal followed.

## DISCUSSION

¶11 A county seeking to commit an individual under WIS. STAT. ch. 51 must prove by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous under one of the five standards of WIS. STAT. § 51.20(1)(a)2.a.-e. *Portage County v. J.W.K.*, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509; § 51.20(1)(a), (13)(e). Each of these standards requires proof of recent acts or omissions demonstrating that the individual is a danger to him or herself or to others. *Langlade County v. D.J.W.*, 2020 WI 41, ¶30, 391 Wis. 2d 231, 942 N.W.2d 277.

¶12 The court may extend the commitment for up to one year upon proof of the same elements. *J.W.K.*, 386 Wis. 2d 672, ¶18; WIS. STAT. § 51.20(13)(g)1., 3. Because the commitment itself may have diminished the individual's dangerous behavior without obviating the need for continued commitment, the county may then rely on the "alternative evidentiary path" of § 51.20(1)(am). *J.W.K.*, 386 Wis. 2d 672, ¶19; § 51.20(13)(g)3. That is, the county may prove dangerousness in extension proceedings not with reference to the individual's recent behavior but instead by showing "that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am). This "standard is not more or less onerous" than the standard for initial commitment, in that both proceedings "require[] proof of <u>current</u> dangerousness." *J.W.K.*, 386 Wis. 2d 672, ¶24 (alteration in original). The purpose of

§ 51.20(1)(am) is merely "to avoid the 'revolving door' phenomena whereby there must be proof of a recent overt act to extend the commitment but because the patient was still under treatment, no overt acts occurred and the patient was released from treatment only to commit a dangerous act and be recommitted." *State v. W.R.B.*, 140 Wis. 2d 347, 351, 411 N.W.2d 142 (Ct. App. 1987).

¶13 Last April, our supreme court clarified that "*going forward* circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d. 231, ¶40 (emphasis added). As this requirement is prospective, it does not apply to Lisa's August 2019 hearing. Therefore, although the trial court here was required to find "a substantial likelihood" of current dangerousness, as defined under § 51.20(1)(a)2.a.-e., it was not required to explain on the record how the relevant facts met any specific dangerousness standard(s). *See* § 51.20(1)(am); *Winnebago County v. S.H.*, 2020 WI App 46, ¶¶13-14, 393 Wis. 2d 511, 947 N.W.2d 761.

¶14 Review of an extension order presents a mixed question of fact and law. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We uphold the trial court's factual findings unless clearly erroneous, but we review de novo whether those facts meet the statutory standard. *Id.*

¶15 As a threshold matter, we must determine whether to resolve Lisa's appeal despite the expiration of her August 27, 2019 commitment order. Lisa concedes that her appeal is moot; that is, she does not argue that she suffers any collateral consequences from the expired order, such that our decision would have a "practical effect upon an existing controversy." *See J.W.K.*, 386 Wis. 2d 672, ¶11 (citation omitted). Lisa instead argues that we should exercise our discretion

to reach the merits of her appeal, because at least three recognized mootness exceptions apply. According to Lisa, her appeal presents issues that (1) arise so often that "a definitive decision is essential to guide the trial courts"; (2) are "likely to arise again and should be resolved by the court to avoid uncertainty"; and (3) are "capable and likely of repetition and yet evade[] review." *See id.*, ¶12 (citation omitted).

¶16    We conclude that Lisa's appeal should be decided on the merits for two reasons. First, the County did not respond to Lisa's argument, thereby implicitly acknowledging that at least one mootness exception applies. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) ("Respondents on appeal cannot complain if propositions of appellants are taken as confessed which they do not undertake to refute." (citation omitted)). Second, trial courts and interested parties might benefit from further guidance on what is often a tricky question: the sufficiency of the evidence supporting the legal determination of dangerousness in an extension proceeding. Although our courts have frequently addressed this topic, including in recent decisions,[3] an additional example may be helpful. This is certainly an issue that occurs frequently but is very often mooted by the passage of time (even where, as here, the parties take advantage of the "fast track" appellate process). *See* WIS. STAT. RULE 809.17. We therefore turn to the merits of Lisa's appeal.

¶17    Lisa appears to concede that she has a mental illness and is a proper subject for treatment, but she disputes that she is dangerous. Specifically, she

---

[3] *See, e.g.*, *Winnebago County v. S.H.*, 2020 WI App 46, ¶¶13-14, 393 Wis. 2d 511, 947 N.W.2d 761; *Winnebago County v. L.F.-G.*, No. 2019AP2010, unpublished slip op. (WI App May 20, 2020).

argues that the County "made no attempt to present evidence that showed that if treatment were withdrawn, [she] would become dangerous under one of the five standards listed in WIS. STAT. § 51.20(1)(a)(2)a.-e." We disagree. The County perhaps could have done more to elicit additional evidence indicating current dangerousness, and we read *D.J.W.* to suggest that it would be well advised to do more in the future. *See D.J.W.*, 391 Wis. 2d. 231, ¶¶40-43, 50-58. But we also note that, in fact, *neither* party at the extension hearing placed much emphasis on the dangerousness element—indeed, in neither party's summations to the trial court does the word "danger" or "dangerousness" (or any synonym) ever appear in the transcript. As a general rule, this required element should not be given such short shrift.

¶18    Nonetheless, it is also clear that the trial court recognized the need to make the requisite factual findings supporting dangerousness, and did so (the court did not reference the specific statutory criteria on which dangerousness was based, but contrary to Lisa's assertion, it was not then required to do so). *See id.*, ¶40. In reviewing those findings, we conclude that they are supported by the evidence, along with reasonable inferences therefrom. *See S.H.*, 393 Wis. 2d 511, ¶14; *see also Outagamie County v. Melanie L.*, 2013 WI 67, ¶38, 349 Wis. 2d 148, 833 N.W.2d 607 ("We accept reasonable inferences from the facts available to the circuit court.").

¶19    We agree with Lisa that the relevant dangerousness standard is WIS. STAT. § 51.20(1)(a)(2)c. Putting that together with the recommitment standard, § 51.20(1)(am), the County was required to establish, by clear and convincing evidence, that there was a "substantial likelihood, based on [Lisa's] treatment record, that … if treatment were withdrawn," Lisa would have "such impaired

judgment … that there [would be] a substantial probability of physical impairment or injury to … herself or other individuals." *See* § 51.20(1)(a)(2)c., (1)(am).

¶20    We find that the County met that standard, but we first acknowledge that the testimony was at times confusing and, for this reason, likely caused the trial court to draw one conclusion that we view as unsupported by the entirety of the record. Andrews's report stated that Lisa had been admitted to inpatient care thirty-three times over the course of her nineteen years under WIS. STAT. ch. 51 commitment. There were nonspecific references to these inpatient admissions throughout the extension hearing. The trial court assumed that the admissions were caused by Lisa's changing, refusing, or transitioning off of medications (the County too makes this argument on appeal). Andrews, Bruett, and Lisa herself testified that Lisa would not take psychotropic medications without a commitment order. Therefore, the trial court concluded that Lisa's medical history clearly indicated that, in a nonmedicated state, she would exhibit behavior sufficiently dangerous to warrant inpatient admission and recommitment.

¶21    From our review of the appellate record, however, including an earlier transcript of a hearing at which Lisa contested her April 2019 inpatient admission, it does not appear that Lisa's prior inpatient admissions were neatly tied to any change in medication status. Instead, Lisa may experience semi-regular distress in the community for various reasons, and medical personnel may at times have responded by changing her medication. This inference is supported by the fact that at all times relevant to this appeal, Lisa was taking Haldol, a long-acting intramuscular drug that is administered in a medical setting and that she would not have been able to discontinue at will. In addition, the plain language of Lisa's medication order requires drug administration "regardless of … consent …

during the period of commitment." Thus, Lisa has never had the capacity to simply (as the County puts it) "refuse[] to comply with the medication order."

¶22 Therefore, we will not consider the evidence of inpatient admissions as directly relevant to the "dangerousness" determination: we have no context for why those admissions occurred or whether or how they related to Lisa's behavior or medications.[4] We further agree with Lisa that standing alone, evidence that she is merely irritable—or even, as the trial court found, "delusional"—is insufficient to establish dangerousness. For example, an individual who believes himself to be Benjamin Franklin, and accordingly dresses in 18th century garb, is certainly delusional, but that does not mean that he is dangerous. Mere eccentricities, whether brought on by mental illness or otherwise, cannot form the basis for a commitment order. Only where the delusion causes the individual to engage in behavior that *threatens physical harm*—to the individual or others—is dangerousness shown. This means that at least some of Lisa's delusions (for example, that her apartment is filled with evil spirits) do not, in of themselves, support a finding of dangerousness, at least on this record.

¶23 Nonetheless, the line separating mere delusional thoughts and dangerousness was crossed in this case because we have evidence directly linking Lisa's Haldol level to behavior posing a significant risk of physical harm. Andrews observed that Lisa was "usually better" right after her biweekly injection. As the injection began to wear off in the second week, however, Lisa's behavior

---

[4] The only concrete description of these admissions in the extension hearing transcript is Bruett's testimony that "none of those [admissions] [we]re very recent." To the extent this fact is relevant, it weighs against recommitment, because it indicates that there has been no recent dangerous behavior necessitating inpatient admission.

became more erratic: there was "screaming and hitting," "hitting her head," and "pulling her hair and screaming." Although generally not life-threatening, such behavior shows a lack of impulse control and violent tendencies and—particularly where it occurs in a vehicle, as happened here at least twice—evidenced a substantial probability of physical harm to Lisa and others. *See* WIS. STAT. § 51.20(1)(a)(2)c.

¶24 In addition to this evidence, we have the predictions of Andrews and Bruett that Lisa would decompensate to the point of dangerousness without a commitment order (which is to say, without medication). We recently stated that "conclusory opinions parroting the statutory language without actually discussing dangerousness, are insufficient to prove dangerousness," but here Bruett and, especially, Andrews were not merely reciting the legal standard. *See S.H.*, 393 Wis. 2d 511, ¶17. Bruett perhaps was relying generally on his clinical judgment, but Andrews's opinion was necessarily informed by her frequent interactions with and observations of Lisa over the course of a year. Such evidence is relevant to the finding of dangerousness.

¶25 Taking these observations and predictions together, we conclude that the trial court did not err in finding clear and convincing evidence of current dangerousness. The unrebutted evidence and expert testimony showed that Lisa would not take medications without a commitment order, that she decompensated as her medication wore off, and that this resulted in erratic and potentially dangerous behavior. It was reasonable for the trial court to assume that such behavior would continue and worsen if medication were discontinued, as would almost certainly occur if the order were not extended, leading to a substantial risk of physical harm to Lisa and others. We affirm.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.